1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ERNESTO ESPINOZA,                          No.  2:11-cv-00461 AC

12                       Petitioner,

13           v.                                   ORDER

14    RICK HILL,

15                       Respondent.

16

17          Petitioner is a state prisoner proceeding through counsel on an amended application for a

18    writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2007 felony conviction for

19    robbery.  ECF No. 25.  The parties have consented to the jurisdiction of the magistrate judge.

20    ECF Nos. 7, 8.  Respondent has filed an answer to the single claim remaining in this case.  ECF

21    No. 39.  Petitioner has not filed a reply, and the time for doing so has long since expired.

22          For the reasons that follow, the petition will be denied on the merits without an

23    evidentiary hearing.

24    I.       Procedural and Factual Background

25                a.   Procedural Background

26          Petitioner Ernesto Becerra Espinoza was convicted following a jury trial in the Superior

27    Court for the County of Shasta of second degree robbery under California Penal Code § 211.

28    Lodged Doc. 1.  The jury found true the enhancement allegations that petitioner committed the

1

1   crime in association with a criminal street gang, and that petitioner had a firearm on his person or

2   in the vehicle.  Id.; Cal. Penal Code §§ 186.22 (b)(1), 12022 (a)(1).  He was sentenced to an

3   aggregate term of fourteen years in state prison: two years for robbery, ten years for the gang

4   enhancement, and two years for the firearm enhancement.  Lodged Doc. 1, 6.

5          Petitioner appealed his conviction to the California Court of Appeal for the Third

6   Appellate District in case no. C056767, raising the following issues: (1) insufficiency of the

7   evidence that the robbery was accomplished by force or fear; and (2) insufficiency of the

8   evidence as related to the gang enhancement.  Lodged Doc. 1, 1-2.  On December 3, 2009, the

9   appellate court affirmed his conviction and the sentence.  Id.

10         Petitioner then filed a Petition for Review with the California Supreme Court in case no.

11  S179410, claiming only that his second degree robbery conviction should be reversed for

12  insufficient evidence that the taking was accomplished by force or fear.  ECF No. 25.  On

13  February 18, 2010, the California Supreme Court denied the petition for review.  Id.

14         Petitioner filed the instant mixed federal habeas petition on February 18, 2011 alleging his

15  conviction should be reversed for: (1) insufficient evidence that the taking was accomplished by

16  force or fear to support the robbery conviction; (2) insufficient evidence that the robbery was

17  committed with the intent to promote, further, or assist criminal conduct by gang members; and

18  (3) insufficient evidence supports the finding of the gang's primary activities.  ECF No. 1.

19  Respondent then sought dismissal of the petition since it contained two unexhausted grounds for

20  relief.  ECF No. 17.  This Court granted respondent's motion to dismiss to the extent that the

21  unexhausted grounds two and three were stricken from the petition without prejudice to refiling.

22  ECF No. 24.  Petitioner was then directed to file a petition in the California Supreme Court and

23  thereafter file an amended petition in this Court containing all exhausted claims within thirty days

24  of the California Supreme Court's decision.  Id.

25         Petitioner filed a state habeas petition in the California Supreme Court on December 19,

26  2011 which was denied on April 18, 2012.  ECF No. 25 at 52.  Petitioner filed an amended §

27  2254 petition in this court on May 16, 2012 which contained three claims for relief: a sufficiency

28  challenge to the robbery conviction, as well as the two newly exhausted sufficiency challenges to

2

1   the gang enhancement.  ECF No. 25.  Respondent moved to dismiss, arguing that the newly

2   exhausted claims were untimely filed because they did not relate back to any timely filed claim in

3   the original habeas petition.  ECF No. 30.  Petitioner opposed the motion, which was heard before

4   Magistrate Judge Gregory Hollows on October 18, 2012.  ECF No. 34.  The motion to dismiss

5   was subsequently granted by order filed November 19, 2012, leaving a single claim: petitioner's

6   original challenge to the sufficiency of the evidence supporting his robbery conviction.  ECF No.

7   35.  Respondent was directed to file an answer to this claim, which he did on February 4, 2013.

8   ECF Nos. 35, 39.

9           b.      Factual Background

10           Petitioner was convicted of robbery for stealing a black shirt and a couple of pairs of

11   Dickies jeans, by force or fear, from a Target store in Redding, California, on the morning of May

12   19, 2005.  Lodged Doc. 1.  At the time of the robbery, Daniel Burrell ("Burrell"), Regina

13   Anderson ("Anderson"), and Steve O'Neill ("O'Neill") were on duty at the Target store.  R.T. 2

14   at 367.[1]  Burrell and Anderson both testified at petitioner's trial.  Id. at 343, 450.

15           Burrell was an asset protection manager for Target.[2]  R.T. 2 at 343-44.  On May 19, 2005,

16   he arrived at work at approximately 8:05 a.m.  Id. at 345.  Shortly after he arrived, three separate

17   Target employees approached him to inform him that four Hispanic male individuals who "just

18   didn't look right" had been waiting outside the store prior to its opening and had entered the store

19   just as it opened.  Id. at 345.  One of these men was petitioner.  Id. at 351.

20           After being approached by the three employees, Burrell went to the closed-circuit

21   television ("CC-TV") room in the back of the store to observe the described individuals on the

22   store's security cameras.  R.T. 2 at 346-47.  The security system included video feeds from

23   various cameras inside and outside of the store, which enabled Burrell to monitor the men as they

24   moved about the store.  Id.  On the video feed, he located the four men in the men's department

---

25   [1]  "R.T." refers to the Reporter's Transcripts lodged by the respondent.  The numeral following

26   "R.T." refers to the specific volume number.

27   [2]  An asset protection manager is the "security manager in charge of identifying and deterring
    theft activity, other safety activity in the store."  R.T. 2 at 343.  Burrell had held this position at
    Target for just about eighteen years at the time of his testimony, and had held the same position in

28   another store for four years prior to his employment at Target.  Id. at 343-44.

1    looking at merchandise near a T-shirt area. Id. at 347. Burrell became concerned that the men

2    might try to steal something after they selected Dickies jeans, which are high-theft merchandise

3    for Target stores in their district. Id. at 357. Burrell's suspicions were further aroused after the

4    group split up, with two individuals heading towards the front of the store and the other two—

5    including petitioner—instead heading towards the garden center. Id. at 356-57. Burrell thought

6    that the two who went towards the front of the store might go and wait in a car in the parking lot

7    or near the store's entrance, so he went towards the front of the store to "try to deter anybody

8    from thinking about leaving the store with merchandise." Id. at 358. Burrell was joined by

9    Anderson at the front of the store. Id. at 357. Burrell observed that while petitioner and his

10   friend (and subsequent co-defendant) Isaac Gonzalez ("Gonzalez") were picking up merchandise,

11   they appeared to be paying more attention to the activity in the store than to the merchandise,

12   which further spurred Burrell's suspicions. Id. at 358.

13       Burrell was concerned because he was the only security officer on duty, so if anything

14   were to happen he did not like his odds. R.T. 2 at 359. Accordingly, he went back to the CC-TV

15   room to pick up live surveillance of the men again. Id. at 357. On the video feed, he saw that the

16   fourth individual had left the store and entered a white vehicle, had driven through the parking lot

17   in a "somewhat circuitous route," and then stopped in front of the garden center. Id. at 363. He

18   also saw that petitioner and Gonzalez, who had gone towards the garden center, had re-entered

19   the main store and met up with "one of the people that they had separated from earlier." Id. at

20   357. Then this third individual walked towards the front of the store, while petitioner and

21   Gonzales walked back towards the men's department, then towards the shoe department, and

22   ultimately back towards the garden center. Id. at 361. While they were in the shoe department

23   and headed towards the garden center, the third individual exited the building and entered the

24   vehicle in front of the garden shop. Id. at 361-62.

25       Burrell then left the CC-TV room and headed towards the garden center, where he was

26   again joined by Anderson as well as O'Neill. R.T. vol. 2, 366. Anderson and O'Neill were each

27   standing next to a checkout stand at the front of the garden center. Id. at 367. The petitioner and

28   Gonzalez then walked towards the front of the garden center. Id. at 368. Anderson testified that

1   as petitioner and Gonzales approached the checkout counter she said to them, "I'll help you at this
2   register." Id. at 459.  She stated that they then looked at each other, one of them (she could not
3   remember who) smiled at the other, and then they both ran out the front doors of the store. Id.
4   Anderson yelled "hey real loud and followed them out the door." Id.  Burrell, who was nearby,
5   also ran out of the store to get his employees back in the store, to see whether the men got into the
6   white vehicle, and to determine if he could recover any merchandise. Id. at 368.  Burrell hopped
7   over a railing to pursue the individuals at a fast walking pace and told the other employees not to
8   pursue the men. Id. at 368-69, 448.  Anderson stopped her pursuit when she reached the railing
9   because employees were not supposed to pursue shoplifters any further than the railing. Id. at
10   465.

11        Petitioner and Gonzalez were a good distance ahead of Burrell; about forty to sixty feet.
12   R.T. 2 at 390, 396.  The white vehicle then drove by Burrell while he was in pursuit and he did
13   not try to stop it. Id. at 369.  He testified that as the car was coming into the driveway, he was
14   walking down the driveway and at that moment he decided to discontinue his pursuit of the two
15   individuals because he saw they were headed towards the white vehicle and he would not be able
16   to catch up with them before they reached the vehicle. Id. at 371.  Burrell said that if the men had
17   walked out of the store and he was able to catch up with them that he probably would have
18   confronted them and tried to recover the merchandise, but if they had run and pushed past him he
19   would not try to detain them. Id.

20        After Burrell turned around to walk back towards the store and tell the police details about
21   the men's vehicle, he heard a "pop-pop" so he started running because "the sound came from the
22   vehicle and it sounded like a gun to me.  And at that point I decided I best get back in." R.T. 2 at
23   371-73.  He said that he was "a little bit concerned for [his] safety." Id. at 372.  However, Burrell
24   also testified that he did not know if the two individuals were in the car at this point and that he
25   had turned away from the vehicle before hearing the "pop-pop" sound. Id.  He specifically stated
26   that he had discontinued chasing the men and was headed back towards the store when he heard
27   the "pop pop." Id. at 416.  The last he saw of the men, the two car doors were open and petitioner
28   and Gonzalez were entering the vehicle. Id.  To Burrell's knowledge, there were no other

1  employees pursuing the men when the "pop pop" sound occurred.  Id. at 448.  Anderson testified

2  that at some point she heard the "pop pop" sound, which caused her concern.  At first she thought

3  it was firecrackers, but Burrell said it could be a gun and she should call the police.  Id. at 460.

4  Later on, after the car left and before the police arrived, Burrell went out to where the car

5  had been located when he heard the "pop pop" sounds because "if that was a gun, if those were

6  gunshots, we'll see if there was any evidence of any gunfire left in that general vicinity."  R.T. 2

7  at 374-75.  He found two shell casings at the location where the car had been, which he pointed

8  out to the police.  Id. at 375.  He was able to give a description of the vehicle as a white Toyota

9  Camry and obtained the license plate number from the surveillance videos to provide for the

10  police.  Id.

11  Burrell testified that the fact that there were four individuals together caused him concern

12  over his personal safety because he was the only security officer on duty that morning.  R.T. 2 at

13  359.  He stated that he was also concerned because petitioner and Gonzales were both bigger than

14  him.  Id. at 359, 367.  Redding Police Officer Rob Peterson testified that in 2005, petitioner was

15  5'8" tall and approximately 180 lbs., Gonzalez was also 5'6" tall and 175 lbs., and the other two

16  men were approximately 5'8" and 150 lbs., and 5'5" and approximately 170 lbs.  R.T. 3 at 606.

17  Burrell was approximately 5'8" or 5'9" and 160 to 180 lbs.  Id. at 388.  On cross-examination,

18  Burrell testified that neither petitioner nor any of the individuals in question ever approached

19  Burrell or any other Target employees or customers, never touched them in any way, and never

20  spoke with them.  Id. at 386-87.

21  Carolyn Martinez ("Martinez"), a Target customer, had parked outside the garden center

22  that morning and heard the gunshots as she was exiting her car.  R.T. 2 at 480-81.  She testified

23  that she immediately knew the sounds were gunshots and that as she heard them she

24  simultaneously saw petitioner and another man "back pedaling" away from Target and towards

25  the white car.  Id. at 483-84.  Because of the sounds she heard, she initially thought the man

26  closest to her, who had clothes draped over his arm, had fired a gun from underneath the garments

27  he was carrying.  Id. at 483.  She identified petitioner as standing next to the man she thought was

28  the shooter because he had the clothes draped over his arm.  Id. at 485.  She testified that she

1    heard both the sounds of three gunshots and the sounds of the shell casings hitting the ground.  Id.

2    at 486.  She was "petrified," so she ran towards the entrance of the Target store in a big hurry and

3    only saw the individuals for a couple of seconds.  Id. at 486-87.

4         Redding Police Officer Bart Langley put out a "be on the lookout" ("BOLO") for a white

5    Camry with the license plate number supplied by Burrell and the car was spotted by California

6    Highway Patrol around the Sacramento area.  R.T. 2 at 470.  Sacramento Police Officers Robert

7    Hamm and Roger Dillon received a call about a vehicle involved in a robbery being pursued by

8    California Highway Patrol in Sacramento.  Id. at 506, 522.  Both officers joined in the chase.  Id.

9         The car eventually stopped in a Fry's electronics store parking lot in Sacramento.  R.T. 2

10   at 509.  When the car stopped, all four occupants jumped out and ran.  Id.  Officer Hamm chased

11   and eventually caught Gonzalez.  Id. at 509-10, 513.  Officer Dillon looked in the car and on the

12   floorboard near the pedals found a .22 caliber Ruger semi-automatic pistol, which he turned over

13   to the crime scene investigator.  Id. at 523.  Sergeant Anthony Taylor was the first supervisor to

14   arrive on scene at the vehicle and started giving directions to the other officers.  Id. at 527.

15   Sergeant Taylor discovered a pair of Dickies jeans and a handgun that had a magazine with

16   rounds in it but no rounds in the chamber on the front passenger seat.  Id. at 527-28.  He also

17   found a third gun wrapped in a blue bag lying on the floor that had one round in the chamber.  Id.

18   at 529.  The blue bag also contained two other magazines and a silencer that could be attached to

19   the barrel of the Ruger.  Id. at 529-31.

20        Crime scene technician Michael Darling determined that the shell casings found by

21   Burrell around the location in the Target parking lot where the white Camry had been waiting

22   were .9 millimeter casings.  R.T. 2 at 498.  Criminalist Ronald Nies processed the .9 millimeter

23   Ruger handgun found in the white Camry and compared the .9 millimeter shell casings found in

24   the Target parking lot with test casings he fired from the .9 millimeter Ruger handgun.  R.T. 3 at

25   570.  He found that the markings on the shell casings discovered at the scene matched the

26   markings on the shell casings from test fired from the .9 millimeter Ruger handgun.  Id. at 575-

27   76.  Barbara Philips, a latent print analyst, testified that she found no fingerprints whatsoever on

28   the .9 millimeter Ruger handgun, the cartridges, or the Smith & Wesson magazine found with the

gun.  Id. at 563.

II.      Standards Governing Habeas Relief Under the AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits,

whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

(2011).  State court rejection of a federal claim will be presumed to have been on the merits

absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

"The presumption may be overcome when there is reason to think some other explanation for the

state court's decision is more likely."  Id. at 785.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

(quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

may constitute "clearly established Federal law," but circuit law has persuasive value regarding

what law is "clearly established" and what constitutes "unreasonable application" of that law.

Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

1057 (9th Cir. 2004).

1   A state court decision is "contrary to" clearly established federal law if the decision

2   "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529

3   U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

4   court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

5   the facts of the particular state prisoner's case." Id. at 407-08.  It is not enough that the state court

6   was incorrect in the view of the federal habeas court; the state court decision must be objectively

7   unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

8       Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

9   Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

10  reasonably applied clearly established federal law to the facts before it. Id.  In other words, the

11  focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399.  Where the

12  state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

13  state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th

14  Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily,

15  without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court

16  denies a claim on the merits but without a reasoned opinion, the federal habeas court must

17  determine what arguments or theories may have supported the state court's decision, and subject

18  those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

19  III.   Petitioner's Claim for Relief

20      Petitioner alleges that the evidence presented at trial was insufficient to support his

21  robbery conviction because no force or fear was used in the taking of the property.[3]  ECF No. 25

22  at 20.  In this vein, petitioner raises two main arguments as grounds for federal habeas relief: (1)

23  that prior to the use of any force or fear, no store employee had any intentions of trying to re-take

24  _____

25  [3] To the extent petitioner contends that the facts of his case are insufficient to constitute an Estes
    robbery under California law, this argument does not support federal habeas relief as it merely

26  challenges a state court's application of state law.  See ECF No. 25 at 21-23 (citing People v.
    Estes, 147 Cal.App.3d 23 (1983); see also Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996)

27  (stating that "alleged errors in the application of state law are not cognizable in federal habeas
    corpus."); Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (" 'it is not the province of a federal

28  habeas court to reexamine state-court determinations on state-law questions' ").

1   the property from the petitioner or any of the other suspects; and (2) that the fleeing of petitioner

2   and Gonzales, coupled with the presence of the two suspects in the car, did not demonstrate a

3   willful creation of fear as an obstacle to the retaking of the property.  ECF No. 25 at 23-24.

4   Petitioner contends in essence that the facts of the crime establish nothing more than petty theft.

5   ECF No. 25 at 26.

6          This is the same claim that petitioner raised on direct appeal.  The California Court of

7   Appeal, the last state court to issue a reasoned decision addressing petitioner's claim, rejected the

8   claim on the merits.  Lodged Doc. 1, 13.  Accordingly, this court reviews the California Court of

9   Appeal decision to determine whether it was contrary to or an unreasonable application of clearly

10   established federal law.  See Ylst v. Nunnamaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d

11   1026, 1034 (9th Cir. 2012).  Because the state court denied relief in a reasoned opinion, review

12   under § 2254(d) is confined to "the state court's actual reasoning" and "actual analysis."  Frantz,

13   533 F.3d at 738.

14          A.     State Court Opinion

15          The state court ruled as follows:

16          Section 211 [of the California Penal Code] provides, "Robbery is
            the felonious taking of personal property in the possession of
17          another, from his person or immediate presence, and against his
            will, accomplished by means of force or fear."  In Gomez, supra, 43
18          Cal.4th 249, our Supreme Court held:  "A taking is not over at the
            moment of caption; it continues through asportation….  A robbery
19          can be accomplished even if the property was peacefully or
            duplicitously acquired, if force or fear was used to carry it away."
20          Our Supreme Court further held, "Mere theft becomes robbery if
            the perpetrator, having gained possession of the property without
21          use of force or fear, resorts to force or fear while carrying away the
            loot."   Put another way, "the use of force or fear to escape or
22          otherwise retain even temporary possession of the property
            constitutes robbery."
23
            Here, Anderson and Burrell followed defendant and his cohorts
24          from the store.  Burrell wanted to see if he could recover any of the
            merchandise.  Although he would not have physically detained
25          defendant and company, if he had been given the opportunity, he
            would have confronted them and tried to recover the merchandise.
26          Burrell continued following them until they were getting into the
            car.  He wanted to be able to give the police a full description of the
27          vehicle, including its license plate number.  Then he heard the
            gunshots.  He thought they could have been shooting at him and
28          decided not to pursue them any further.

Defendant contends that he and "his companion were merely trying to flee the store, reach the car, and make their escape; they did nothing to instill fear by sight or sound, such as turning to confront or shouting threats, to any employee who might be pursuing them. Similarly, the two men in the car did not get out as if to confront anyone, nor did they yell threats at [] Burrell or any other store employee." While these statements may be true as far as they go, they entirely disregard the fact that Burrell and Anderson had followed the men, and defendant or one of his "companions" fired a gun in the direction of Burrell and Anderson. To suggest this is not a show of force or an attempt to instill fear in Burrell and his coworkers is ludicrous. The men fired the shots to prevent Burrell from continuing to follow them, either to reclaim the property or to better identify them. In either case, the purpose was to facilitate defendant's getaway, his escape. The use of force to escape or carry away the loot elevated this offense to robbery. There was sufficient evidence of force or fear to support a robbery conviction.

Lodged Doc. No. 1 (internal citations omitted).

B.    Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt. United States v. Winship, 397 U.S. 358, 364 (1970). In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1974). If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." Id. at 326

C.    Analysis

The California Court of Appeal's decision is not an unreasonable application of clearly established federal law.[4] The state court reasonably rejected petitioner's first argument challenging the force or fear element, because petitioner was still in the process of carrying away the goods and had not yet reached a place of safety. The Court of Appeal's conclusion that "[t]he men fired the shots to prevent Burrell from continuing to follow them, either to reclaim the

---

[4] Although the California Court of Appeal did not expressly refer to Jackson, that fact does not affect the application of the AEDPA standard. Cf. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (holding that the state may comply with the AEDPA standard without even being aware of governing Supreme Court decisions, so long as ruling does not contradict them).

1    property or to better identify them" is amply supported by the record evidence.  Viewing the

2    evidence in the light most favorable to the prosecution, a rational juror could have found that the

3    gun was fired to aid in petitioner's getaway with the merchandise.  Accordingly, the Court of

4    Appeal's rejection of this basis for petitioner's claim is reasonable.

5         Petitioner's second argument  -- that his flight from the store coupled with the presence of

6    his two cohorts in the car was not sufficient to create fear in the victims – is defeated by the

7    testimony from two store employees that they subjectively experienced fear.  R.T. 2 at 372, 460.

8    There is also evidence that Burrell turned and ran after the "pop pop" sound and then saw

9    Anderson crouched near the ground after the sounds occurred, from which a trier of fact could

10   reasonably infer that the men were frightened by the gunfire.  Id.  There is no requirement that the

11   perpetrator intend to cause fear in the victim.  See Cal. Penal Code § 211.  Therefore, the Court of

12   Appeal reasonably rejected this basis for petitioner's claim.

13        It simply cannot be said that no fairminded jurist could agree with the California Court of

14   Appeal's decision finding sufficient evidence to support the force or fear element of robbery.  See

15   Bobby v. Dixon, 132 S. Ct. 26, 27 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 786

16   (2011).  Petitioner's argument would be more convincing if he had merely run out of the store in

17   a different direction than the getaway vehicle in which his cohorts and numerous weapons were

18   later found.  Had petitioner simply fled Target grounds without re-uniting with his fellow cohorts

19   who were armed gang members, then the evidence would establish no more than a petty theft.

20   However, those are not the facts this court is reviewing.  After viewing the evidence in the light

21   most favorable to the prosecution, a rational trier of fact could have found the essential elements

22   of the crime of robbery beyond a reasonable doubt.  Therefore, the Court of Appeal reasonably

23   rejected petitioner's claim for relief.

24        Because § 2254(d) bars relief on the one claim remaining in this case, the amended

25   petition for writ of habeas corpus is denied.

26   IV.    Certificate of Appealability

27        Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States

28   District Courts, "[t]he district court must issue or a deny a certificate of appealability when it

1    enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of

2    appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial

3    showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either

4    issue a certificate of appealability indicating which issues satisfy the required showing or must

5    state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).  For the reasons

6    set forth herein, petitioner has not made a substantial showing of the denial of a constitutional

7    right.  Therefore, no certificate of appealability should issue.

8        Accordingly, IT IS HEREBY ORDERED that:

9        1.  The amended petition for writ of habeas corpus (ECF No. 25) is denied; and

10       2.  This court declines to issue a certificate of appealability.

11   DATED: August 7, 2014

12   _____
     ALLISON CLAIRE
13   UNITED STATES MAGISTRATE JUDGE

13